**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                  Criminal Action No. 5:15-cr-40

RICHARD CERVI, JR.,

    Defendant.

## **REPORT AND RECOMMENDATION**

This matter comes before the Court on Defendant Richard Cervi, Jr.'s ("Defendant" or "Cervi") four motions to suppress evidence filed on July 6, 2015. ECF Nos. 20-23. The Government filed responses to the motions on July 16, 2015. ECF No. 25-28. This Court held an evidentiary hearing and argument on the motions on July 20, 2015. Cervi appeared in person and by his counsel Brendan S. Leary, Esq. The Government appeared by David J. Perri, Esq. During the hearing, the Government presented the testimony of Corporal Eric McFarland of the West Virginia State Police. Additionally, this Court admitted the Government's Exhibit 1 (video of the Cervi's traffic stop) and the Defendant's Exhibit 1 (Corporal McFarland's report) into evidence.

## **I. INTRODUCTION**

**A. Background**

On June 2, 2015, Cervi was named in a three count indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2); possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j), 924(a)(2); and possession with intent to distribute methamphetamine, in violation of 18 U.S.C. §§ 841(a), (b)(1)(C). An initial appearance and arraignment were held on June 11, 2015. A detention hearing was held on June 17, 2015, and the

Court granted the Government's motion to detain Cervi pending the final disposition of his case. Cervi now moves the Court to suppress evidence and statements collected during a February 11, 2015, traffic stop and search of his rented vehicle.

**B. The Motions**

1. Motion to Suppress the Search of Vehicle for Lack of Consent. ECF No. 20.
2. Motion to Suppress the Search of Mr. Cervi's Vehicle for Unreasonably Extension of the Traffic Stop. ECF No. 21.
3. Motion to Suppress Search of Vehicle for an Illegal Traffic Stop. ECF No. 22.
4. Motion to Suppress Statements for Lack of *Miranda* Warnings. ECF No. 23.

**C. Recommendation**

I recommend that the Defendant's motions to suppress evidence, ECF Nos. 20-23, be **DENIED** because: (1) Corporal McFarland had probable cause to stop Cervi's vehicle; (2) the facts surrounding this case reveal that Cervi was not detained in a way analogous to arrest and Corporal McFarland's inquiry into whether Cervi had drugs in the vehicle did not necessitate *Miranda* warnings; (3) Corporal McFarland had reasonable suspicion to extend Cervi's traffic stop; and (4) the preponderance of the evidence supports that Cervi gave valid and voluntary oral consent for Corporal McFarland to search his vehicle. Even if the Defendant did not consent to the search of his vehicle, the inevitable discovery rule would nevertheless apply.

## II. FINDINGS OF FACT

During the morning of February 11, 2015, Corporal Eric McFarland ("Corporal McFarland") of the West Virginia State Police was parked at the ten-mile marker on Interstate 70 near Triadelphia, West Virginia. As a member of the West Virginia State Police's Mountaineer Highway Interdiction Team, Corporal McFarland is assigned to patrol interstate roads. Around 8:30 a.m.,

Corporal McFarland noticed Cervi driving eastbound in a red 2013 Dodge Avenger with a New Mexico license plate. Finding Cervi possessed certain "criminal indicators," Corporal McFarland pulled out of the interstate median and began to follow Cervi. Soon after, Corporal McFarland witnessed Cervi pass a vehicle without using a turn signal. Consequently, Corporal McFarland pulled Cervi over near the twelve-mile marker on Interstate 70.

During the suppression hearing, Corporal McFarland testified that, once he approached Cervi's vehicle, he made several observations that suggested to him Cervi was working as a drug courier, or at the very least, driving without a license. First, Corporal McFarland noted that Cervi only provided him with a Pennsylvania identification card, not a driver's license, and he had "a good bit of money in his wallet." Additionally, Corporal McFarland recalled that the vehicle possessed an "overwhelming odor of air fresheners." Suspecting that Cervi was driving without a license, holding "trip money,"[1] and using air fresheners to conceal any suspicious scents, Corporal McFarland asked Cervi to exit his vehicle and sit in the front seat of his police cruiser. Corporal McFarland testified that he frequently asks motorists to sit in his police cruiser because it gives him a chance to speak with them and observe them while writing a ticket or warning to determine whether there is "any further suspicion" to extend the vehicle stop.

Once Corporal McFarland and Cervi were inside the police cruiser, Corporal McFarland asked Cervi where he was coming from and what he did for a living. Cervi explained that he was driving back from Wheeling, West Virginia after delivering some items to a coworker. Cervi stated that he worked as a production assistant and was a member of the Army Reserve. Corporal

---

[1] Corporal McFarland stated that people who are "paid to transport narcotics or weapons . . . from Point A to Point B" are generally given "trip money" in advance.

McFarland, a member of the military, began to ask Cervi questions about his service. Cervi was unable to answer these questions.

Next, Corporal McFarland contacted the state police communications center to run a driver's license check, vehicle license check, and criminal background check. Cervi admitted to Corporal McFarland that his driver's license was suspended. Roughly eight minutes later, the state police communications center contacted Corporal McFarland and notified him that Cervis' vehicle was a rented vehicle from Hertz. The state police communications center also confirmed that Cervi's driver's license was suspended and he had a criminal record, including prior theft and drug delivery charges.

After requesting a tow truck to take Cervi's vehicle to Middle Creek Garage located in Triadelphia, West Virginia, Corporal McFarland asked Cervi if there was "anything in that car that shouldn't be?"[2] Cervi denied that any weapons, alcohol, or bulk currency were in the vehicle. However, Cervi stated "there might be" a minimal amount of marijuana or speed[3] inside his luggage. Later, Cervi told Corporal McFarland that he uses speed "every few days." Throughout Corporal McFarland's conservation with Cervi, he observed Cervi continually chewing and sucking on the lips and cheek. During the suppression hearing, Corporal McFarland testified this behavior was common with people on methamphetamine. Cervi next asked whether he was going to jail. Corporal McFarland responded that it "depend[ed] on what's in [the vehicle]." Corporal McFarland elaborated, explaining,

---

[2] Any transcription of the audio recording submitted by the Government in Exhibit 1 is not an official transcript.

[3] According to Corporal McFarland's testimony, "speed" is a common term for methamphetamine.

4

> I do interdiction full time. . . . This is what I do. I pull people over, get a feel for them, I see what's going on. I search vehicles. I find criminal indicators when people pass me, that's what I look for. . . . Then I get cars on the side of the road. I find drugs. This is all I do. This is what they pay me to do. That is my sole purpose in life.

Corporal McFarland also told Cervi that he had lied several times to him and was "displaying characteristics of . . . deception."

Next, Corporal McFarland asked Cervi is he was "going to give [him] consent to search the vehicle." Cervi stated that he "knew [his] rights" but he was "not trying to cause problems here." Corporal McFarland responded that "it's not causing problems." Corporal McFarland then stated,

> What I'm going to do is I'm going to ask you for consent to search the vehicle. You can say 'yes' or you can say 'no.' It doesn't matter to me because I have other tools at my disposal to use in order to get into that vehicle . . . and that's the course I'll have to go. It's no big deal. I don't take it personal.

Cervi responded that he was "not taking it personal either. I want you to do your job and I feel like . . . no matter what, like you said, it's at your disposal (inaudible). . . . [However,] I don't feel like a gave probable cause . . . to be searched like that." Corporal McFarland again told Cervi that he had the right to deny a search of his vehicle. Corporal McFarland also told Cervi that, if he allowed officers to search his car, he was permitted to stop the search at any time. Cervi responded that if Corporal McFarland "[felt] the need to search [the] vehicle then I'm gonna say do it." Corporal McFarland again asked Cervi if he was giving consent to search the vehicle. Cervi replied,

> I guess at this point . . . I know my rights I, I don't feel like it's right in my heart that I did anything to . . . give you, but with my past and stuff like that I guess . . . you have . . . enough to. Like you said, it doesn't matter, you can get a warrant, you can make it happen. I don't want to stop you from doing your job (inaudible).

Soon after this exchange, Corporal McFarland explained to Cervi that he was writing him a ticket for driving on a suspended license and he was not permitted to drive the vehicle due to his suspended license. Corporal McFarland said that he already had the "wrecker" on the way and he

5

would search his vehicle at the towing garage. Before they left to drive to the towing garage, Cervi asked if he could close the windows on his car. Corporal McFarland volunteered to close the windows and collect Cervi's cell phone. Cervi told Corporal McFarland that his phone was located in the center console of the vehicle. While retrieving the cell phone, Corporal McFarland noticed a high pressure lighter under the driver's seat of the vehicle. During the suppression hearing, Corporal McFarland stated similar "torches" are used to smoke marijuana out of a bong or pipe.

Once Corporal McFarland returned to his cruiser, Cervi rode with him to the towing garage. Once at the garage, Cervi was shown a lobby "where he c[ould] go sit down." Cervi was unsupervised during the search of his vehicle. The search revealed methamphetamine, credit cards not belonging to Cervi, and a revolver. Cervi was then arrested.

### III. DISCUSSION

In his motions to dismiss, Cervi makes the following arguments: (1) Corporal McFarland did not have probable cause to stop Cervi's rented vehicle and, instead, pulled his vehicle over for pretexual reasons; (2) Cervi was not offered *Miranda* warnings while subject to custodial interrogation inside Corporal McFarland's police cruiser; (3) based on the United States Supreme Court's recent holding in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), Corporal McFarland unreasonably extended the traffic stop in order to conduct an impermissible vehicle search; and (4) Cervi did not voluntarily give Corporal McFarland consent to search the rented vehicle

In response to Cervi's motions, the Government argues that: (1) the stop was proper because Corporal McFarland witnessed Cervi make a traffic violation; (2) the totality of the circumstances support that Cervi was not "in custody" for *Miranda* purposes; (3) *Rodriguez* is distinguishable from the facts of this case and, based on information collected during the initial traffic stop, Corporal

6

McFarland had basis to continue his investigation; and (4) Cervi gave Corporal McFarlard consent to search his vehicle and even if he had not given consent, the discovery of the evidence was inevitable.

**A. Cervi's Claim that Corporal McFarland Made an Illegal Pretextual Stop of His Vehicle**

Cervi claims that "Corporal McFarland did not have probable cause to stop" his vehicle. ECF No. 22 at 4. Instead, Cervi contends that he was pulled over for pretextual reasons, citing that "his vehicle had New Mexico license plates" and Corporal McFarland "believed that this vehicle from out of state had to be involved in the drug trade." *Id.* at 3.

"Because an automobile stop is a seizure of a person, the stop must comply with the Fourth Amendment's requirement 'that it not be unreasonable under the circumstances.'" *United States v. Wilson*, 205 F.3d 720, 722 (4th Cir. 2000) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). "[S]uch action must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *Id.* at 730 (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990)). "That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity . . . ." *Id.*

In this case, Corporal McFarland observed Ceri pass a vehicle without using a turn signal, a violation of West Virginia law. W. Va. Code § 17C-8-8(a) (West 2015). This violation, however minor, gave Corporal McFarland probable cause to stop Cervi's vehicle. *Hassan El*, 5 F.3d 726 at 730. The fact that Corporal McFarland suspected Cervi may be involved in criminal activity or

7

exhibited other "criminal indicators" is irrelevant. *Id.* It is further irrelevant that Cervi may not have pulled Cervi over if his vehicle did not have New Mexico plates. *Id.* Thus, because Corporal McFarland observed Cervi make a traffic offense, the stop was proper.

**B. Cervi's Claim that He Was Not *Mirandized* When Interrogated While in Custody**

Cervi next alleges that he "was placed into a custodial interrogation and not given *Miranda* warnings." ECF No. 23 at 8. Cervi contends that his encounter with Corporal McFarland inside the police cruiser was "overly hostile and authoritative." *Id.* at 6. Further, Cervi states that he was not informed of his arrest status or his freedom to leave the police cruiser. Based on these factors, Cervi argues that his "freedom of movement was restrained akin to that of formal arrest." *Id.* at 7.

*Miranda* warnings are required when a person is interrogated while in custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). However, it must be noted that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Cervi was originally stopped by Corporal McFarland for failing to use a turn signal. During a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992)

(quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988)). "[A] routine traffic stop does not place the motorist in custody so as to require *Miranda* warnings. Such stops are analogous to *Terry* stops where no *Miranda* warnings are required" *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). Further, as elaborated in *Sullivan*,

> *Miranda* warnings are required only when the motorist is detained to an extent analogous to an arrest. But a routine traffic stop does constitute a Fourth Amendment seizure so that when the purpose justifying the stop is exceeded, the detention becomes illegal unless a reasonable suspicion of some other crime exists. When the stop is over and its purpose served, however, mere questioning by officers, without some indicated restraint, does not amount either to custody for *Miranda* purposes or a seizure under the Fourth Amendment.

*Id.*

Cervi argues that *Miranda* warnings were required "because of the location of the interrogation, the atmosphere created by Corporal McFarland, the control exerted by Corporal McFarland, and the fact that he was not advised of his arrest status or his freedom to leave." ECF No. 23 at 5. However, the facts surrounding this case reveal that Cervi was not detained in a way analogous to arrest and Corporal McFarland's inquiry whether Cervi had drugs in the vehicle did not necessitate *Miranda* warnings. During Cervi's traffic stop, he was never handcuffed, weapons were never drawn, and Corporal McFarland allowed Cervi to sit in the front seat of his cruiser. *See United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (concluding "that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."). Cervi was never told that he was detained and the conservation between Cervi and Corporal McFarland took place during the day on the side of the interstate. *Sullivan*, 138 F.3d at 132 (finding probative that the officer's "conversation included no threats or statements that [the defendant] was

being detained, and it occurred at midday on the side of a highway in full public view.").

Although Cervi now contends that he was not advised of his arrest status or freedom to leave, Cervi stated multiple times during his encounter with Corporal McFarland that he "kn[ew] [his] rights." Additionally, when Cervi asked about his arrest status, Corporal McFarland noted that it "depend[ed] on what's in" his vehicle. Because Corporal McFarland had not yet searched Cervi's vehicle, Cervi was clearly aware that he was not under arrest. The consideration of these facts demonstrate that Cervi was not subject to custodial interrogation. *See Id.* ("The mere fact that [the officer] did not affirmatively advise [the defendant] that he could refuse to answer [the officer's] questions or that he was free to go did not transform the encounter into a custodial interrogation.")

Further, when Corporal McFarland arrived at Cervi's vehicle window, he made several observations that suggested suspicious activity, including that Cervi handed him a Pennsylvania identification card (not a driver's license), Cervi had a substantial amount of money in his wallet (later found to be $542.00), and the vehicle had an overwhelming odor of air fresheners. As Corporal McFarland had done with many motorists he countered, he invited Cervi into the front seat of his cruiser. With Cervi inside his cruiser, Corporal McFarland ran a records check and, while the check was pending, asked Cervi basic questions such as where he was going and where he worked. Quickly, Corporal McFarland found that Cervi was dishonest about his service in the Army Reserve and noticed him chewing and sucking on his lips and cheeks–an indication of drug use according to Corporal McFarland. These facts, combined with evidence of overwhelming air fresheners and large sums of cash, provided Corporal McFarland reasonable suspicion of additional crime. Accordingly, Corporal McFarland's inquiry of whether there "was anything in [Cervi's] car that shouldn't be" did not require any warning under *Miranda*. *Sullivan*, 138 F.3d at 131.

10

## C. Cervi's Claim That Corporal McFarland Unreasonably Extended the Traffic Stop

Cervi cites the United States Supreme Court's recent holding in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), to argue that the length of the traffic stop was unreasonable under the Fourth Amendment. ECF No. 21 at 5. Under this claim, Cervi makes the following argument:

> The stop of Mr. Cervi's vehicle began at 8:31 A.M. and Corporal McFarland began writing a ticket at 8:44 A.M. The reasonable time for this stop was that approximately thirteen minute window. However, the encounter was then extended well beyond this reasonable time simply because Corporal McFarland wanted to search Mr. Cervi's vehicle. Indeed, Corporal McFarland, in a moment of stunning honesty, tells Mr. Cervi what the purpose of the stop is here: Mr. Cervi fit a "criminal indicator" and that his vehicle was going to be searched. This impermissible profiling was nothing more than a pretext that prolonged the stop well into the 9:00 hour so that the vehicle could be towed and searched.

*Id.*

In *Rodriguez*, the defendant was stopped by a Nebraska officer for veering onto the shoulder of the highway–a violation of state law. *Rodriguez*, 135 S. Ct. at 1612. The stop began just after midnight. *Id.* A police dog was with the Nebraska officer during the stop. *Id.* The officer approached the defendant's vehicle, identified himself, and asked the defendant why he had driven onto the shoulder. *Id.* at 1613. The defendant explained he attempted to avoid a pothole. *Id.* The officer "then gathered [the defendant's] license, registration, and proof of insurance, and asked Rodriguez to accompany him to the patrol car. [The defendant] asked if he was required to do so, and [the officer] answered that he was not. [The defendant] decided to wait in his own vehicle." *Id.* The officer began to run a records check on the defendant. *Id.* In the meanwhile, the officer asked the defendant and his passenger where they "were coming from and where they were going." *Id.* The passenger explained that they were returning to Norfolk, Nebraska after looking for a car that was for sale. *Id.* The officer returned to his cruiser, completed the records check on the defendant, and called for an

additional officer. *Id.* The officer then wrote a warning ticket for the defendant. *Id.* The officer returned to the vehicle and gave the defendant the warning ticket. However, next,

> [a]lthough justification for the traffic stop was "out of the way," [the officer] asked for permission to walk his dog around [the defendant's] vehicle. [The defendant] said no. [The officer] then instructed [the defendant] to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. [The defendant] complied. At 12:33 a.m., a deputy sheriff arrived. [The officer] retrieved his dog and led him twice around the [vehicle]. The dog alerted to the presence of drugs halfway through [the officer]'s second pass. All told, seven or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine.

*Id.* (internal citations omitted).

The Eighth Circuit affirmed the District Court's denial of the defendant's motion to suppress. The Supreme Court "granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at 1614. The Supreme Court's decision reversed the Eighth Circuit. The Supreme Court held that a traffic stop "justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The Court also noted that, unlike checking a driver's license or conducting a records check, a dog sniff is not a part of a routine traffic stop because it "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at 1615 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). Thus, absent additional reasonable suspicion, officers may not conduct a dog sniff if the "mission" of the traffic stop is already completed. *See Id.*

Contrary to Cervi's claim, the facts in *Rodriguez* are distinguishable from the facts of this case. Here, Cervi was originally stopped for failing to use a turn signal. Thus, at first, Coporal

McFarland's "mission" for this routine traffic stop was to check Cervi's license, "determin[e] whether there [were] outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Id.* at 1615. Without additional reasonable suspicion, the seizure is unlawful if the stop was prolonged after issuing Cervi ticket. *Id.* However, unlike in *Rodriguez*, additional reasonable suspicion was established before Corporal McFarland had completed the original "mission" of the traffic stop. As discussed above, when Corporal McFarland arrived at Cervi's vehicle window, he made several observations that suggested suspicious activity, including that Cervi handed him a Pennsylvania identification card, not a driver's license, Cervi had a substantial amount of money in his wallet, and the vehicle had an overwhelming odor of air fresheners. Further, while conducting a records check, Corporal McFarland discovered that Cervi was driving with a suspended license. These facts, collected prior to the completion of the stop, provided Corporal McFarland reasonable suspicion of additional crime which permitted Corporal McFarland to continue the stop. The holding in *Rodriguez* was narrow–determining only whether police "may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." *Id.* at 1614 (emphasis added). Thus, because Corporal McFarland had reasonable suspicion to continue Cervi's stop, *Rodriguez* is inapplicable to this case.

**D. Cervi's Claim That He Did Not Voluntarily Consent to a Search of His Vehicle**

Cervi last claims that "[t]he action of Corporal McFarland created a coercive situation where [he] had no option but to consent to the search" of his vehicle. ECF No. 20 at 5. Cervi notes that the "general atmosphere during the encounter was hostile," the traffic stop lasted for nearly twenty minutes before he gave "begrudging consent," and his ultimate consent was only "acquiescence" to authority. *Id.* at 6-7.

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). Consent, however, must be more than mere "acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (U.S. 1968). If challenged, the Court must determine, based upon the "totality of the circumstances," whether the Defendant's consent was knowing and voluntary, which the Government must prove by a preponderance of the evidence. *See, e.g., United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *United States v. Buckner*, 473 F.3d 551, 553-55 (4th Cir. 2007). Factors "to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter)." *United States v. Boone*, 245 F.3d 352, 361-62 (4th Cir. 2001) (citing *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996)). "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

In this case, the totality of the circumstances support that Cervi voluntarily consented to a search of his vehicle. Cervi is thirty years old and stated multiple times that "knew [his] rights." The traffic stop occurred on a busy interstate during the morning hours. When Cervi gave consent to search the vehicle, Corporal McFarland was the only officer present. Further, Corporal McFarland explained to Cervi that he could not consent to a search, and, if he did consent, he was permitted to

stop the search at any time. All of these factors weigh heavily in support of Cervi's voluntary consent. *See United States v. Elie*, 111 F.3d 1135, 1145 (4th Cir. 1997) (finding relevant the defendant's familiarity with the criminal justice system.); *Lattimore*, 87 F.3d at 651 (finding relevant that the defendant was twenty-nine years old, the stop took place during the day "on a well-traveled highway," and only one officer was present); *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (holding that a "highly relevant" factor in determining voluntary consent is whether the defendant was informed of his right to decline a search).

Cervi does not allege that he did not consent to a search, but instead argues that his consent was not voluntary. Cervi argues that his consent was "a begruding submission," in part, because a significant portion of the stop took place inside Corporal McFarland's police cruiser and Corporal McFarland told Cervi that it did not matter if Cervi granted consent because he had "other tools at [his] disposal to use in order to get into that vehicle." However, simply because consent was given inside Corporal McFarland's cruiser does not suggest the consent was coercive. *See United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009) (finding that the defendant's consent to search the automobile was voluntary, even though it was given to the officer only after he was removed from his car by a police officer and placed in the back of a police cruiser with a police dog in the compartment behind him). Further, the fact that Corporal McFarland told Cervi that he had "other tools at [his] disposal" to search the vehicle did not extinguish consent. In *Lattimore*, the officer told a motorist that, if he did not consent to a search, the officer would "call a drug dog right up the road to come down . . . and let him search [the] car." *Lattimore*, 87 F.3d at 649. The motorist remarked that it"really ma[de] no difference" if he provided consent or not. *Id.* Similarly, in response to Corporal McFarland's comments that he had "other tools" to search Cervi's vehicle, Cervi

15

responded that "it doesn't matter, you can get a warrant, you can make it happen. I don't want to stop you from doing your job . . . ." As such, in review of the facts of this case, while the length of the stop may weigh against other factors suggesting consent, the preponderance of the evidence strongly supports that Cervi gave valid and voluntary oral consent for Corporal McFarland to search his vehicle.

Furthermore, even if Cervi did not provide voluntary consent, the inevitable discovery rule would nonetheless apply. Under this doctrine, illegally seized evidence may be admitted if the Government can prove "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Yet, mere speculation that the evidence *could* be discovered is insufficient, instead, the evidence is only admissible where evidence *would* have been lawfully discovered. *See United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998) ("We have no doubt that [a detective] could have used the dog, but whether she would have presents an entirely different question.").

Even without Cervi's voluntary consent, the items discovered by officers would have been inevitably discovered by other lawful means. For example, in this case, the "automobile exception" would apply. "[A]n exception to the warrant requirement has long been recognized where probable cause is established to believe that a vehicle contains contraband or evidence of a crime." *United States v. Lawing*, 703 F.3d 229, 239 (4th Cir. 2012). During Cervi's conversation with Corporal McFarland, Cervi admitted "there might be" marijuana and methamphetamine inside his vehicle. Cervi further elaborated that the drugs were likely inside his luggage. These statements provided probable cause that Cervi's vehicle contained illegal drugs. *See Ornelas v. United States*, 517 U.S. 690, 696 (1996) (holding that probable cause exists "where the known facts and circumstances are

sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found."). Corporal McFarland's statement to Cervi that he had "other tools" available to search the vehicle satisfies by a preponderance of the evidence that Corporal McFarland, if not provided consent, would have searched Cervi's vehicle under the automobile exception. Additionally, because Cervi was driving without a license, his vehicle was towed to a nearby garage. A subsequent inventory search of the vehicle would have also resulted in the discovery of the seized evidence. *See*, *e.g, Florida v. Wells*, 495 U.S. 1 (1990); *United States v. Matthews*, 591 F.3d 230, 232 (4th Cir. 2009).

## IV. RECOMMENDATION

For the reasons stated above, the undersigned recommends that the Defendant's motions to suppress evidence, ECF Nos. 20-23, be **DENIED**.

Any party may, within fourteen (14) days of the filing of this report and recommendation, file with the Clerk of the Court written objections identifying the portions of the report and recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of record. Failure to timely file objections to the report and recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation.

DATED: July 29, 2015 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE